CHEHARDY, Judge.
Aadvance [sic] Insulation Services appeals a determination by the Office of Worker’s Compensation that Harry Whiting, Jr. is entitled to worker’s compensation benefits for temporary total disability from December 7, 1996 through July 31, 1997. The issue on appeal concerns the presumption of intoxication. We affirm the OWC judge’s determination that plaintiff is entitled to the benefits.
The parties stipulated that Whiting was employed by Aadvance, that he was injured in the course and scope of his employment on December 7, 1996, that his injury was a closed fracture of the right proximal humerus, and that the fracture resulted in open reduction internal fixation surgery on December 8, 1996. They also stipulated to the medical treatment administered, to the amounts of the medical expenses, to the amount of Whiting’s average weekly wage, and to the amount of benefits payable if benefits were found warranted.
However, Aadvance contested plaintiffs right to recover benefits, raising the intoxication defense. The basis for the defense was that a urine screen performed while plaintiff was in the hospital emergency room following the accident indicated a positive result for cocaine.
laUnder La. R.S. 23:1081(l)(b), an employee is not entitled to worker’s compensation benefits for an injury which is caused by his intoxication at the time of the injury. There is a presumption that the employee was intoxicated if there is evidence at the time of the accident of either on- or off-the-job use of a non-prescribed controlled substance. La. R.S. 23:1081(5).
The worker’s compensation judge found that defendant had “failed to establish the requisites for [the] intoxication defense or that intoxication had any connexity to the accident.” The judge also found that defendant had “failed to conform to the drug testing scientific and technical requirements required by the statute.”
On appeal defendant asserts the worker’s compensation judge was clearly wrong in finding that the defendant did not meet its burden of proving the intoxication defense, when the statute establishes a presumption of intoxication and causation once the defendant establishes the use of cocaine by the plaintiff. Further, defendant argues, the plaintiff did not rebut the presumption established in favor of the employer.
In response plaintiff argues that the court applied the appropriate standard of law in determining that there was no evidence of drug use, because the hospital records were not conclusive as to the identity of the urine sample. Further, he asserts, even if the trial judge used the incorrect standard of law and the presumption of intoxication applies, the trial judge was correct in awarding benefits to plaintiff because the evidence at trial rebutted that presumption.
It is uncontested that Whiting was injured by electrical shock while installing insulation under a house. The testimony was as follows:
Kim Jackson was acting foreman and supervisor for the Aadvance Insulation crew on the day of the accident. He had worked with Harry Whiting in the past, considered him a good worker, and had never seen him use alcohol or drugs on the job. He had never known him to be under *687 the influence of alcohol while at work. On that morning he picked up Harry from his house between eight and nine o’clock and dropped him off at [¿the job site. He said Harry was “as usual, calm,” and he observed nothing out of the ordinary about him. He observed nothing that would have kept Harry from performing his work. He would not have allowed him to work if he had seen anything, but would have informed the manager. He did not work directly with Harry that day, but simply dropped him off at the job site.
Joel Cooper, who had worked for Aad-vanee for four years, was on the job with Harry Whiting that day. He had worked with Whiting before, considered him a good worker, and had never had any problems with him. He had never known him to work under the influence of alcohol or drugs. On the day of the accident Harry performed his duties in the usual manner. They were working on opposite sides of the house.
Cooper said the job involved going under the house, putting the insulation material under the floor between the rafters and putting “tiger claws” or rods under it. He noted there are often all kinds of wires-“phone wires, electric wires, alarm wires”-under the rafters. The workers have to place the insulation material between the wire and the flooring. They push it up to the floor, then put up the “tiger claws” to keep the material from falling out. Their hands touch everything, including the wiring.
Cooper said they had been working less than 10 minutes before the accident happened. Whiting had probably installed only a few of pieces of insulation. He called Cooper, who ran to him and got under the house as fast as he could to get to Whiting’s section. Waiting was underneath the fence, with his leg hitting the fence and his hand on a wire.
[I]t was hitting right here and he was shaking. He didn’t call my name so I ran under there and I grabbed his boots, and I kind of shoved with all my might, you know, and pushed the boots, pushed them off the wire. He was unconscious and I slapped him. I slapped him a couple of times to regain his stamina. He came back to, and I pulled him out and then I called the home owner and they called the paramedics.
Cooper testified he would have reported it to his superiors if he thought a coworker was under the influence of drugs or alcohol on the job. It was his policy as a | ¡foreman. Whiting seemed normal to him. He admitted he had no knowledge of Whiting’s personal life and only knew what he saw of him that morning when he got to the job. He denied knowing that Whiting had cocaine in his system. Cooper stated he would not touch an uninsulated wire because he was aware he could get shocked.
Cooper testified on redirect examination that the job they were on that day was a difficult one because there was a lot of wire hanging under the house, it was dark, and there were a lot of ducts. In addition, he said, “They had fences under there, fences that aren’t supposed to be under a house.”
Dr. Francis Avery Ragan, Jr. testified as an expert in the field of toxicology. He is the director of the clinical pharmacology toxicology laboratory at Charity Hospital, which now encompasses the whole of the Medical Center of Louisiana. He also is the director of the toxicology lab of the Orleans Parish Coroner’s Office and a consultant toxicologist with the Jefferson Parish Coroner’s Office. He testified his lab at the Medical Center is not certified as a forensic laboratory and the tests performed there are for medical purposes only.
Dr. Ragan admitted the medical records indicated that tests were ordered on patient number 96970173, named “Unknown Dundee” on the record. The diagnosis was listed as electrocution. A urine sample was taken as is routine in trauma cases. The result of the testing on that *688 urine was positive for guaifenesin, ephedrine and pseudoephedrine, which are common ingredients in cough syrup; urine alcohol; and cocaine.
The cocaine findings consisted of a metabolite of cocaine as well as unmetabol-ized “parent” cocaine in the urine. Dr. Ragan stated the presence of the parent cocaine indicated it probably would have ingested within six hours prior to admission to the emergency room. He did not know the amount picked up because the hospital lab does not quantify in the test results, but said it could have been as low as 100 nanograms.
IfiHe noted the sample also contained cocaethylene, a compound he has seen only in someone who has been drinking alcohol and also using cocaine. He admitted there is a slim chance the compound could show up if someone was not drinking, but he had not usually seen cocaethylene only in someone with alcohol as well as cocaine or a cocaine metabolite in the urine. In his opinion cocaine in the system within six hours would impair the user’s ability. He admitted, however, that based on urine levels a tester cannot say more than that the person had the drug in the very recent past and that impairment cannot be determined by urine levels.
Questioned about why some of the medical records show the patient’s name as “Unknown, Dundee,” Dr. Ragan testified that when patients are admitted to the hospital trauma center they come in as “Unknown, Dundee” and then when they can verify the patient’s identity the name is changed to the correct patient name. When a patient is admitted the patient is assigned a number. The number on the “Unknown, Dundee” urine test was the same as the patient number assigned to Harry Whiting.
Dr. Ragan admitted, however, that he had never followed up or checked to ascertain that “Unknown, Dundee” was Harry Whiting. He relied on the computer, which said that “Unknown, Dundee” and Harry Whiting have the same hospital number. He also said the name “Unknown, Dundee” would be used only once within the same 24-hour period. If other unknown patients came in they would be assigned other “Unknown” names.
At the behest of plaintiffs counsel Dr. Ragan read the Emergency Department Triage Record. He acknowledged that under “Chief ComplainVMechanism of Injury” was listed “electrocution,” but there was a notation that had been scratched out which said, “Fell out of back of moving pick-up truck.” He also acknowledged that in another portion of the medical records, there was an indication that on 12/4/96 the patient had received medication. That date was three days prior to the accident here and three days before Harry Whiting’s admission as Patient Number 96970178.
17Pr. William George, an expert in pharmacology and toxicology, testified next. His laboratory at Tulane University is certified by the College of American Pathologists as a forensic urine drug testing lab. He testified that forensic drug testing differs from medical drug testing. Medical drug testing is directed to assisting in treatment of a person. Forensic testing, however, is specifically directed toward urine for legal matters. He stated that by regulation a test result of 100 nanograms of cocaine would be reported as a negative. The standard cutoff for a positive test is 150 nanograms per mil as a confirmation test.
Dr. George stated further that the basic principal of toxicology is to know what the dose is in order to know what the degree of nanogram is in a patient. A dose distinguishes a toxin from a remedy. The analyst must know the level to understand the amount of impairment.
Dr. George testified that if plaintiff had used cocaine within a few hours of his admission, “you would have expected to see some kind of effect in terms of CNS stimulation, nervousness, time-space changes.” Dr. George said he did not take issue with Dr. Ragan or his laboratory, *689 which both have a good reputation. However, he said, his concern was the identity of the specimen.
Harry Kuchler testified he has known plaintiff for nine or ten years. He was with plaintiff the night before the accident at a pool hall in Kenner and that Whiting drank beer. He could not say how much he drank, however. He had worked with plaintiff and had never known him to have any problems with drugs or alcohol on the job.
Harry Whiting took the stand on his own behalf. He testified that he had been working for about 45 minutes to an hour before the accident happened. He was placing insulation between the studs under the floor and placing the hangers under it. He had to slide it between the wires and the floor. Somehow he got hung on a wire and couldn’t get off it. The wire caught him on the wrist. He does not remember anything after that. He didn’t touch the wire on purpose, but it was old wire.
|sHe denied taking cocaine the night or the morning before the accident and denied that he was under the influence of cocaine. Plaintiff admitted to drinking beer the night before the accident and said he had “a couple of pitchers.” He denied that he usually drank a case of beer a day. He admitted that he smokes as well. He said that if his medical records showed he stated that he had been drinking “24 beers a day for the past 24 years,” it was not true, but instead if he told the nurse that he was “playing with” her.
The intoxication defense to claims for workers’ compensation is provided in La. R.S. 23:1081, which states in pertinent part:
(1) No compensation shall be allowed for an injury caused:
[[Image here]]
(b) by the injured employee’s intoxication at the time of the injury....
[[Image here]]
(2)In determining whether or not an employer shall be exempt from and relieved of paying compensation because of injury sustained by an employee for any cause or reason set forth in this Subsection, the burden of proof shall be upon the employer.
(3)For purposes of proving intoxication, the employer may avail himself of the following presumptions:
[[Image here]]
(5) If there was, at the time of the accident, evidence of either on or off the job use of a nonprescribed controlled substance as defined in 21 U.S.C. 812, Schedules I, II, III, IV, and V, it shall be presumed that the employee was intoxicated.
(6) The foregoing provisions of this Section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question of whether the employee was under the influence of alcoholic beverages or any illegal or controlled substance.
* * *
(8) In order to support a finding of intoxication due to drug use, and a presumption of causation due to such intoxication, the employer must prove the employee’s use of the controlled substance only by a preponderance of the evidence.
[[Image here]]
(12) Notwithstanding any language to the contrary, once the employer has met the burden of proving intoxication at the time of the accident, it shall be presumed that the accident was caused by the intoxication. The burden of proof then is placed upon the employee to prove that the intoxication was not a contributing cause of the accident in | border to defeat the intoxication defense of the employer. [Emphasis added.]
In reasons for judgment the office of workers’ compensation judge pointed out that the Louisiana Administrative Code, Title 40, Chapter 15-Section 1507(C), re *690 quires that confirmatory test level for cocaine metabolites is 150 ng/ml. She stated:
Additionally, the statute provides the criteria for establishing chain of custody and drug testing procedures that apply in job related accident cases. The court finds that the requirements set forth in the rule were not adhered to as written. Additionally, the discrepancy in the doctor’s and nurse’s notes casts doubt upon the correct identity of the specimen which was tested. The specimen did not conform to the confirmatory test level, as required.
The OWC judge also noted the testimony of the witnesses corroborated that the claimant was not intoxicated on the morning of the accident, citing the testimony of Kim Jackson and Joel Cooper.
In support of appellant’s argument that the court erred in finding it had failed to establish that plaintiff had used cocaine, Aadvance cites us to Williams v. Louisiana Coca-Cola Company, 94-810 (La.App. 5 Cir. 3/1/95) 652 So.2d 108, writ denied, 95-797 (La.5/12/95), 654 So.2d 349, in which this Court discussed an employer’s burden of proof of the intoxication defense as follows: “We interpret the statute to mean that a preponderance of evidence of use of a non-prescribed controlled substance is necessary to apply the presumption of intoxication. Once the presumption of intoxication is obtained, the presumption of causation under La.R.S. 23:1081(12) attaches.” 652 So.2d at 111.
In Williams we found that introduction of hospital records showing that cocaine metabolites were present in the plaintiffs system proved it was more probable than not that the plaintiff had ingested cocaine that was in his body at the time of the accident. We noted the burden then shifted to the employee to prove intoxication was not a contributing cause of the accident. We found that the trial court had improperly relied only on the plaintiffs own uncorroborated testimony that he had never taken cocaine and that one-sided loading of the truck caused it to jack-knife. Accordingly, we held that |inthe hearing officer was manifestly erroneous in determining that the plaintiff had met his burden of proving that his intoxication was not a contributing cause of the accident and we reversed the trial court’s ruling in favor of the employee.
Here, however, we find the facts support the plaintiffs case:
As in any matter in which there is a rebuttable presumption, the burden rests with the party challenging the presumption to convince the fact-finder that his proposed conclusion is more correct than the presumed one. A presumption does not have any probative value, but merely provides the fact-finder with a conclusion in the absence of proof to the contrary.... “Presumptions are indulged to supply the place of facts; they are never allowed against ascertained and established facts. When these appear, presumptions disappear.” [Citations omitted.]
Turner v. Turner, 455 So.2d 1374, 1379 (La.1984).
In this case, the proof of intoxication is neither as clear as in Williams, nor is the rebutting evidence as limited. Not only is there confusion in the identity of the patient known as “Unknown, Dundee,” but also there is rebutting testimony from plaintiff and his supervisors that he was not intoxicated on the day of the accident.
In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness’s uncontradicted testimony, although the witness is a party, absent “circumstances casting suspicion on the reliability of this testimony.” The trial court’s determinations as to whether the worker’s testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error .... Indeed, the manifest error/clearly wrong standard of appellate *691 review applies in compensation actions even when the trial court’s decision is based solely upon written reports, records or depositions. [Citations omitted.]
Bruno v. Harbert Intern. Inc., 593 So.2d 357, 361 (La.1992).
Under the evidence in this case we find no basis to set aside the fact-finder’s determinations. The conflicting information in the medical records, given the “unknown” name on some of them, combined with the notations of medication administered on dates prior to plaintiffs admission to the hospital, cast doubt on the reliability of the records. Further, the witnesses testimony was unanimous that plaintiff was not intoxicated on the j^day of the accident. We find no reasonable basis for us to ignore the deference due the findings of the trier of fact. ‘Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
For the foregoing reasons, the judgment is affirmed. Costs of appeal are assessed against the appellant.

AFFIRMED.